+

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEENAN WILKINS, | )  No. C 08-1084 MMC (PR) |
| Plaintiff, | ) |
| | )  **ORDER GRANTING MOTION TO SEAL** |
| v. | )  **MEDICAL RECORDS; GRANTING** |
| | )  **ALAMEDA COUNTY DEFENDANTS'** |
| SHERIFF GREG AHERN, et al., | )  **MOTION FOR SUMMARY** |
| | )  **ADJUDICATION; GRANTING PRISON** |
| Defendants. | )  **HEALTH SERVICES DEFENDANTS'** |
| | )  **MOTION FOR SUMMARY JUDGMENT** |

**(Docket Nos. 172, 176, 195)**

On February 22, 2008, plaintiff, a pretrial detainee then incarcerated at the Santa Rita County Jail ("SRCJ"), filed the above-titled civil rights action under 42 U.S.C. § 1983.[1] Thereafter, plaintiff twice amended his complaint. The Court found the allegations in plaintiff's second amended complaint ("SAC"), when liberally construed, stated the following cognizable claims for relief based on events alleged to have occurred during plaintiff's incarceration at SRCJ: retaliation, unconstitutional conditions of confinement, unlawful use of excessive force, denial of due process, denial of medical care and denial of mental health care. The SAC was ordered served on approximately sixty defendants.

Now before the Court are (1) the motion for summary adjudication filed on behalf of

---

[1]Plaintiff currently is incarcerated at the Glenn Dyer Detention Facility in Oakland.

United States District Court

For the Northern District of California

Alameda County employees against whom plaintiff has asserted claims for the denial of medical and mental health care ("Alameda County defendants"), and (2) the motion for summary judgment filed on behalf of Prison Health Services, Inc. and certain of its employees ("PHS defendants"), against whom plaintiff also has asserted claims for the denial of medical care.  Plaintiff has opposed the motions, defendants have replied, and plaintiff has filed a sur-reply.

**DISCUSSION**

I.    Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

United States District Court

For the Northern District of California

1    For purposes of summary judgment, the court must view the evidence in the light most

2    favorable to the nonmoving party; if the evidence produced by the moving party conflicts

3    with evidence produced by the nonmoving party, the court must assume the truth of the

4    evidence submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158

5    (9th Cir. 1999).  The court's function on a summary judgment motion is not to make

6    credibility determinations or weigh conflicting evidence with respect to a disputed material

7    fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

8    1987).

9    II.   Background

10   Plaintiff claims several instances of inadequate medical and mental health care during

11   his incarceration at SRCJ.  He names as defendants (1) SRCJ officials and employees;

12   (2) Criminal Justice Mental Health ("CJMH"), a division of Alameda County's mental health

13   department that provides mental health care in the county jails, and certain of its employees;

14   and (3) Prison Health Services, Inc. ("PHS"), an organization that contracts with the

15   Alameda County Sheriff's Department to provide medical care in the county jails, and certain

16   of its medical staff.[2]

17   A.   The Provision of Medical Care Services at SRCJ[3]

18   PHS is a national organization that provides health care in correctional facilities, and it

19   has been doing so at SRCJ since 1987.  (Declaration David Sanchas Supp. Alameda Cty.

20   Defs.' Mot. Summ. J. ("Sanchas Decl.") ¶ 3.)  Alameda County contracts with PHS to

21   provide medical care for all inmates at SRCJ.  PHS maintains a staff of nurses, nurse

22   practitioners and physicians onsite at SRCJ, and these medical health professionals, not

23   Sheriff's officials, make all decisions regarding the course of an inmate's medical treatment.

24

25

26   [2]The SRCJ and CJMH defendants have filed a joint motion for summary adjudication of plaintiff's medical and mental health care claims against them.  The PHS defendants have filed a separate motion for summary judgment addressing plaintiff's medical claims against them.

27

28   [3]The following facts are undisputed.

1    (Declaration of Mark Foster Supp. Alameda Cty. Defs.' Mot. Summ. J. ("Foster Decl.") ¶¶
2    4-6.)

3              B.    The Procedure for Inmates to Obtain Medical Care at SRCJ

4              Prior to admission to SRCJ, inmates are screened by PHS personnel to ensure they are
5    medically cleared for admittance and that medical issues are identified and scheduled for
6    follow-up care.  Thereafter, if an inmate needs medical treatment, he submits a medical
7    request slip, also referred to as a sick call request slip, to PHS directly, either by personally
8    handing it to PHS medical personnel or by placing it in a medical/sick call box.  Deputies and
9    other SRCJ employees are not involved in this request process.  They do not review the
10   medical request slips and are not privy to the confidential information contained therein.
11   (Foster Decl. ¶¶ 7-9.)

12             PHS staff receive the sick call request slips and prepare a list of inmates to be seen.
13   The list is given to deputies who escort the inmates to the nurse's station maintained in each
14   housing unit.  The decision to refer an inmate to a doctor is made based on the nurse's
15   assessment and the inmate's medical symptoms.  Deputies and other SRCJ employees are not
16   involved in deciding whether a particular inmate should be seen by a physician.  (Foster
17   Decl. ¶¶ 10-11.)

18             In the event of a medical emergency observed by a deputy or other jail official, the
19   deputy or official will immediately call a nurse and advise such individual of the medical
20   situation.  Such a call requires a response by the nurse on call, as individual deputies do not
21   assess whether an inmate requires medical care.  In addition, each cell is equipped with an
22   intercom, which permits the inmate direct contact with Jail Housing Control personnel, in
23   order that medical care can be summoned in the case of a medical emergency.  (Foster Decl.
24   ¶¶ 12-15 13-15.)

25             C.    Mental Health Services at SRCJ

26             CJMH is a division of Behavioral Health Care Services, Alameda County's mental
27   health department.  CJMH staffs a clinic with mental health care professionals within SRCJ
28   and provides inmates with mental health assessment, treatment and suicide prevention care.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

((Declaration of Mildred Swafford Supp. Alameda Cty. Defs.' Mot. Summ. J. ("Swafford Decl.") ¶ 5.)

When inmates arrive at SRCJ, they must complete a screening form, which includes questions relating to psychiatric issues. If an inmate identifies psychiatric problems on the screening form, a medical nurse will refer the inmate to CJMH for follow-up. A CJMH mental health professional will then see the inmate for a more thorough mental health assessment, which includes obtaining a past psychiatric history, a medication history, a suicide risk assessment and a mental status examination. The initial goal is to determine the most likely diagnosis, identify the most pressing mental health issue, and decide how soon the inmate needs to be seen again and whether he needs to be seen by a psychiatrist for medication. (Swafford Decl. ¶¶ 6-7.)

Patients may be seen for follow-up in the clinic area of the jail or in the inmate's housing unit. CJMH logs inmate appointments at the clinic into a computer and provides an appointment list to deputies, who are dispatched to bring inmates into the clinic. If an inmate is seen in the housing unit, mental health workers visit the inmate where he is housed. CJMH also makes mental health care workers available twice a week in the mental health housing unit, Unit 9, to deal with emergent situations. (Swafford Decl. ¶ 8.)

In addition to being referred for mental health care by the screening nurse as described above, an inmate can self-refer by presenting a sick call slip to the nurses, who then pass it on to CJMH. Further, deputies or medical nurses can refer an inmate for evaluation even absent an inmate's request, although CJMH cannot compel an inmate to accept treatment absent a court order. While deputies can refer an inmate to CJMH, they play no role in the clinical assessment of that inmate. (Swafford Decl. ¶ 9.)

CJMH staff psychiatrists can prescribe psychiatric medication to inmates as medically appropriate. (Declaration of Fred Rosenthal Supp. Alameda Cty. Defs.' Mot. Summ. J. ("Rosenthal Decl.") ¶ 2, Declaration of Brian Thomas Supp. Alameda Cty. Defs.' Mot. Summ. J. ("Thomas Decl.") Thomas Decl. ¶ 2.) Neither the Director of CJMH nor licensed therapists who work for CJMH are legally authorized to prescribe medication. (Swafford

Decl. ¶ 13; Declaration of Thomas Resburg Supp. Alameda Cty. Defs.' Mot. Summ. J. ("Resburg Decl.") Resburg Decl. ¶ 3.)

III.     Deliberate Indifference Standard

As noted, plaintiff claims several instances of constitutionally inadequate medical and mental health care while he was incarcerated at SRCJ.  Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.[4]  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Serious medical needs include a prisoner's mental health needs.  See Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle v. Gamble, 429 U.S. at 104).  A prison official is deliberately indifferent if he knows a prisoner faces a "substantial risk of serious harm" and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference."  Id. Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. See McGuckin, 974 F.2d at 1060.

---

[4]Plaintiff was a pretrial detainee at the time his claims arose.  Claims by pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment.  See Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979).  Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, the Ninth Circuit applies the Eighth Amendment standard of review to pretrial detainees' claims, including claims of inadequate medical care.  See Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996) (holding Eighth Amendment guarantees provide minimum standard of medical care for pretrial detainees).

**United States District Court**
For the Northern District of California

IV.    <u>Motion to File Records Under Seal</u>

In order to protect plaintiff's privacy in the instant action, the Alameda County defendants, i.e., SRCJ and CJMH, have moved to file under seal plaintiff's medical and mental health records submitted in support of their motion for summary adjudication. Plaintiff has not objected to defendants' motion.  The Court finds good cause for granting the motion, and, for the following reasons, further finds plaintiff will not be prejudiced thereby. First, the PHS defendants, who have filed a separate motion for summary judgment with respect to plaintiff's medical claims, have submitted a complete copy of plaintiff's medical records in support of their motion for summary judgment and have served plaintiff with a copy thereof.  (<u>See</u> Docket Nos. 197, 198, 199, 200 & 210).  Second, the record shows plaintiff has obtained from CJMH a copy of his mental health records for the relevant time period.  (<u>See</u> Documents Filed Under Seal Supp. Alameda Cty. Defs.' Mot. Summ. J. Ex V at 108-113.)  Further, plaintiff has relied on records from both his medical and mental health files in support of his opposition to the motions for summary judgment.  Consequently, the Court will grant the motion to file the records under seal in the interest of plaintiff's privacy, and will summarize and cite to the records as appropriate in the instant order.

V.    <u>Plaintiff's Medical Claims</u>

Plaintiff brings five claims of alleged constitutionally inadequate medical care against SRCJ officials and employees and PHS medical staff.[5]  The Court addresses below each of plaintiff's claims in turn; the facts are undisputed unless otherwise noted.[6]

---

[5]The SRCJ defendants against whom plaintiff asserts medical care claims are: Deputies Anderson, Arnold, Arrivas, Bao, Barrosa, Brawley, Cabreras, Cody, Dalton, De La Fuente, Gonzales, Robertson, Snider, St. Denis, and Strickland; Sgts. Molloy and Shaull; Technicians Bryan and Marks; and Commander Harris.

The PHS defendants against whom plaintiff asserts medical claims are: Dr. I-Fei Chen, Dr. Harold Orr, Wilfredo Reyes, L.V.N, Maria Sardi, R.N., and Prison Health Services, Inc.

[6]As the medical claims brought against the SRCJ defendants arise from the same events as the medical claims brought against the PHS defendants, the Court addresses jointly the evidence and arguments of both groups of defendants with respect to each medical claim.

United States District Court

For the Northern District of California

A.      Broken Finger – May 2007

1.      Background

Plaintiff claims he did not receive timely and adequate pain care from SRCJ and PHS staff for a broken finger.  The evidence submitted by the parties in support of and opposition to the motions for summary judgment shows the following:

On May 16, 2007,[7] plaintiff accidentally slammed his finger in a heavy door at some time after 10:00 p.m.  (Opp'n Ex. I-2.)  Approximately ten minutes after plaintiff notified a deputy of his injury, Nurse J. Comer ("Nurse Comer") arrived, examined the finger, and bandaged it.  (Decl. Rocky Tuttle Supp. Alameda Cty. Defs.' Mot. Summ. J. ("Tuttle Decl.") ¶¶ 2-4; Opp'n Ex. I-2.)  Additionally, Nurse Comer contacted Dr. Wilson, who told Nurse Comer to schedule an x-ray for plaintiff for the next day and prescribed Motrin for five days, until May 21.  (Decl. Harold Orr Supp. PHS Defs.' Mot. Summ. J. ("Orr Decl.") ¶ 7 & Ex. B PHS228-00426, 00483.)  Nurse Comer scheduled an x-ray for the following day and cleared plaintiff to return to his cell.  (Tuttle Decl. ¶ 4.)

The next day, May 17, an x-ray was taken of plaintiff's finger.  The x-ray showed the finger was broken.  That same date, Dr. Wilson ordered the dressing on the finger to be changed every day until the finger was healed.  (Orr Decl. ¶ 7 & Ex. B PHS228-00425, 00483.)

The next day, May 18, Nurse Mastroianni requested an orthopedic consultation for plaintiff's finger injury.  She also prescribed the oral antibiotic Keflex.  (Orr Decl. ¶ 8 & Ex. B PHS228-00483.)

On May 21, the dressing on plaintiff's finger was changed.  That same date, plaintiff filed a SRCJ grievance, complaining that he had not yet received his x-ray results or been provided with pain medication for the pain in his finger.  (Opp'n Ex. G.)  May 21 also was the final day of plaintiff's Motrin prescription.

A dressing change was scheduled for the next day, May 22, but plaintiff was out for a

_____

[7]All further dates referenced in this section are in 2007, unless otherwise noted.

United States District Court

For the Northern District of California

1    court appearance.  On May 23, when the dressing on his finger was changed, plaintiff

2    requested pain medication.  He was prescribed Vicodin for seven days, until May 30.  (Orr

3    Decl. ¶ 8a & Exs. B PHS228-00443, 00481.)

4          On May 24, plaintiff had an orthopedic consultation.  A splint was put on his finger

5    and he was scheduled to return for follow-up in one month.  (Orr Decl. ¶ 8 & Ex. B PHS228-

6    00451.)

7          On June 1, two days after the final day of plaintiff's Vicodin prescription, plaintiff

8    submitted a request for a refill, which request stated: "Pain Meds Ran Out for Finger."  (Ex.

9    B PHS228-00508.)  In response to his request, he was seen on June 6 by Nurse Anderson.

10   She examined plaintiff and noted no signs or symptoms of distress.  She referred plaintiff to

11   Nurse Mastroianni, who saw him the next day, June 7, and refilled his Vicodin prescription

12   for an additional seven days, through June 14.  (Orr Decl. ¶ 9 & Ex. B PHS228-00425,

13   00444, 00479.)

14         On June 10, plaintiff submitted an SRCJ grievance, complaining that he had not

15   received adequate medical attention for the pain caused by his broken finger.  (Opp'n Ex. H-

16   1.)  The grievance was investigated by defendant Sgt. M. Molloy ("Sgt. Molloy"), who, on

17   June 12, asked PHS to provide a written response outlining the treatment plaintiff had

18   received for his injury.  (Decl. M. Molloy Supp. Alameda Cty Defs.' Mot. Summ. J.

19   ("Molloy Decl.") ¶¶ 5-6 & Ex. C.)  On June 14, PHS responded, summarizing plaintiff's

20   May 16, 23 and 24 visits with medical personnel.  Additionally, Molloy was told by PHS that

21   the continual use of pain medication can cause severe medical problems and, consequently,

22   in each case, PHS must balance the benefits of continued use of pain medication against

23   other potential harm to the patient.  Plaintiff's SRCJ grievance subsequently was denied.

24   (Molloy Decl. ¶ 9; Opp'n Ex. H-2.)

25         On June 21, plaintiff was seen for follow-up for his finger injury by the orthopedic

26   doctor.  It was noted that plaintiff had lost his splint and was five weeks post-injury.  The

27   doctor's medical plan was for plaintiff to increase his activity as tolerated.  No further

28   treatment was prescribed.  (Orr Decl. ¶ 10 & Ex. B PHS228-00444.)  The records do not

United States District Court

For the Northern District of California

1    reflect that plaintiff made any further medical complaints regarding the May 16 injury to his

2    finger.

3                    2.    Analysis

4                         a.    Alameda County Defendants

5          Plaintiff maintains that the failure of certain SRCJ personnel to adequately respond to

6    his finger injury and subsequent complaints of pain amounted to deliberate indifference to his

7    serious medical needs.  The Court, however, finds plaintiff has raised no triable issue of fact

8    with respect to deliberate indifference on the part of any SRCJ defendant.  Rather, the

9    undisputed evidence shows that SRCJ personnel promptly responded to and investigated

10   plaintiff's complaints of injury and pain, and appropriately referred him to PHS for treatment.

11   Further, the undisputed evidence shows the SRCJ personnel were not put on notice that a

12   substantial risk of serious harm to plaintiff existed.  In particular, there is no dispute that

13   SRCJ deputy Tuttle immediately summoned medical care on being told by plaintiff of the

14   finger injury, PHS Nurse Comer responded to Tuttle's call for medical care within ten

15   minutes, and Sgt. Molloy investigated plaintiff's grievance regarding medical care, which

16   investigation showed plaintiff had been seen daily by medical personnel after the initial

17   response by Nurse Comer, the finger had been x-rayed the day after the injury, follow-up

18   medical appointments had been provided, and plaintiff had seen an orthopedist

19   approximately a week after the injury.

20         Additionally, the undisputed evidence shows SRCJ personnel did not act with

21   deliberate indifference to plaintiff's needs for pain medication.  In particular, there is no

22   dispute that medical assessments and decisions regarding prescription pain medication are

23   not within the purview of SRCJ personnel.  Further, the undisputed evidence shows that

24   when investigating plaintiff's grievance Sgt. Molloy also investigated plaintiff's complaint of

25   inadequate pain management, and PHS advised Sgt. Molloy that pain medication, in fact, had

26   been prescribed, but that because continued use of pain medication can cause severe medical

27   problems, PHS had exercised its best medical judgment in deciding the length of time in

28   which plaintiff would be given such prescription medication.

United States District Court

For the Northern District of California

Plaintiff's contention that SRCJ personnel failed to adequately respond to his complaints of pain in the period between his two seven-day prescriptions for Vicodin likewise do not suggest SRCJ personnel acted in conscious disregard of a serious risk of harm to plaintiff. In particular, the undisputed evidence shows that SRCJ personnel knew PHS staff were treating plaintiff and using their medical judgment for his complaints of pain, and that SRCJ grievance unit investigations failed to reveal any reason for SRCJ personnel to believe PHS was indifferent to any serious medical need.

Based on the above, the Court concludes there is no evidence from which a reasonable trier of fact could conclude any SRCJ defendant had the subjective state of mind required to establish deliberate indifference to plaintiff's serious medical needs.

b.     PHS Defendants

Plaintiff claims PHS staff acted with deliberate indifference to his serious medical needs by failing to provide him with prompt and adequate treatment for his finger injury. The undisputed evidence shows, however, that the injury to plaintiff's finger was promptly diagnosed and appropriately treated by PHS staff. In particular, such evidence shows the following: within ten minutes of reporting his injury, plaintiff was seen by Nurse Comer, who bandaged the finger, prescribed Motrin for five days, and scheduled an x-ray for plaintiff; the next day, plaintiff had an x-ray that showed the finger was broken; the following day, an orthopedic consultation was ordered and plaintiff was prescribed oral antibiotics; three days later, the dressing on plaintiff's finger was changed; two days after that, when plaintiff had been without Motrin for one day due to the expiration of his prescription, plaintiff was prescribed Vicodin for pain for seven days; the next day, plaintiff had an orthopedic consultation and a splint was put on his finger; one week later, after plaintiff had been without Vicodin for one day due to the expiration of his prescription, plaintiff submitted a request for a refill and within one week his prescription was refilled; one week after that prescription expired plaintiff was seen for follow up for his finger injury by the orthopedic doctor and no further treatment was prescribed.

Plaintiff further claims PHS medical staff acted with deliberate indifference because

they failed to treat his finger pain until May 23, seven days after the injury.  The Court finds plaintiff's contentions unsupported by the evidence.  As noted, plaintiff was treated with Motrin from May 16, the day of his injury, through May 21.  Dr. Orr, the PHS Health Care Manager, has attested that plaintiff's treatment with Motrin for the first week after his injury was medically appropriate, based on the nature and extent of plaintiff's injury, and plaintiff has not presented evidence that calls such medical assessment into dispute.  In particular, although plaintiff was seen almost daily by medical personnel during the time he was taking Motrin, there is no evidence in the medical records that shows plaintiff complained to PHS personnel that he was not receiving adequate pain control.  Further, plaintiff went only one day without any form of pain medication, specifically, he would have taken his last Motrin on May 21 and was prescribed Vicodin on May 23, and the record shows the reason plaintiff was not seen by a medical practitioner on May 22 was because he was away at court.

Plaintiff also claims PHS staff acted with deliberate indifference when his first Vicodin prescription expired on May 30 but was not refilled until June 7.  The Court finds no evidence that the delay in refilling the Vicodin prescription amounted to deliberate indifference.  In particular, the evidence shows plaintiff's Vicodin prescription was not scheduled to be renewed automatically, and, as attested by Dr. Orr, due to the length of time that had elapsed following plaintiff's injury it would have been appropriate to provide no further narcotic pain medication after the first prescription expired.  (Orr Decl. ¶ 55.)  Consequently, PHS personnel could not have been expected to renew the prescription without a specific complaint from plaintiff that he was suffering from pain that would warrant such renewal.  In view of plaintiff's June 1 medical request expressing only that his pain medication had run out, and not that he was suffering from pain, let alone severe pain, and because it was medically appropriate that further narcotic pain medication not be provided at such time, the time between plaintiff's refill request and the refilling of the prescription was not unreasonable.

Based on such evidence, the Court finds plaintiff has failed to raise a triable issue as to whether the PHS defendants acted with deliberate indifference to plaintiff's serious

United States District Court

For the Northern District of California

1  medical needs when diagnosing and treating his broken finger and providing him with pain

2  medication.

3      B.    Treatment After Alleged August 8, 2007 Assault

4          1.    Background

5      Plaintiff claims that at approximately 4:30 p.m. on August 8, 2007, a deputy grabbed

6  his right arm and threw him to the ground in his cell and, as a result, he hit his head and

7  suffered a blackout and concussion, swelling and bruising on the left side of his head, and

8  sharp pains in his left shoulder.  He further claims he pushed the medical call button in his

9  cell but no deputy came until pill call, at approximately 6:30 p.m.  Plaintiff further claims he

10  did not receive adequate treatment for his injures.  (SAC ¶ V(C) at 3:17-5:6.)

11      The evidence submitted by the parties in support of and opposition to the motions for

12  summary judgment shows the following:

13      On August 8, plaintiff submitted a request for medical services for injuries he alleges

14  he received as a result of his having been assaulted.  (Orr Decl. ¶ 11 & Ex. B PHS228-

15  00507.)  That same date, at 6:30 p.m., plaintiff was seen by defendant Wilfredo Reyes,

16  L.V.N., ("Reyes"), for complaints of headache and shoulder pain.  Plaintiff told Reyes that he

17  had fallen.  He also reported a history of shoulder injuries.  Reyes examined plaintiff, found

18  no signs of acute distress, and scheduled plaintiff for further evaluation the following day at

19  sick call.  (Orr Decl. ¶ 11 & Ex. B PHS228-00439.)  That same date, plaintiff, after being

20  examined by Reyes, filed an SRCJ grievance, complaining he had been assaulted by a deputy

21  and denied immediate medical care.  (Decl. Ben Schaull Supp. Alameda Cty. Defs.' Mot.

22  Summ. J. ("Schaull Decl.") ¶ 3.)

23      The next day, August 9, plaintiff was seen at sick call by Dr. Pajong.  According to

24  Dr. Pajong's notes, plaintiff complained of left temple pain without double vision and light

25  sensitivity.  There was a question as to whether plaintiff had lost consciousness when he was

26  injured.  No other signs of acute distress were found.  Dr. Pajong assessed plaintiff as having

27  fallen and suffered a left temple hematoma and questionable left shoulder pain.  Vicodin was

28  prescribed, x-rays were ordered, and a follow-up appointment with an orthopedist was

scheduled.  (Orr Decl. ¶ 12 & Ex. B PHS228-00438-00439.)  Dr. Pajong told plaintiff to let medical staff know immediately if plaintiff started to suffer from double or blurred vision. (Ex. B PHS228-00506.)

On the next day, August 10, plaintiff complained of episodic double vision.  That same date he was seen by medical staff.  At the time of his examination he stated he was not having any trouble with his vision.  On examination, plaintiff's vital signs were normal. Tenderness was noted to his forehead and left side of the head.  Plaintiff was scheduled to follow up for further evaluation three days later, on August 13.  (Orr Decl. ¶ 13 & Ex. B PHS228-00440.)

On August 13, it was recommended that plaintiff be seen at the eye clinic for his complaint of double vision; a request for an internal consultation with the eye clinic was submitted that day.  (Orr Decl. ¶ 14 & Ex. PHS-228-00440.)  Also on August 13, plaintiff had x-rays taken of his skull and shoulder for his complaints of pain following his injury. (Ex. B PHS228-0497.)

On August 15, plaintiff was seen in sick call for review of his x-ray results.  He was informed that the x-ray results were negative for injury, and that he would be seen by the orthopedist for further follow up.  Plaintiff's vital signs were normal and he denied any signs or symptoms of nausea, vomiting or double vision at that time.  The plan was for plaintiff to return to the clinic as needed.  (Orr. Decl. ¶ 15 & Ex. B PHS228-00440.)

The next day, August 16, plaintiff was seen by Dr. Bachellor, an orthopedic specialist. Plaintiff did not complain of stiffness in his neck.  He reported a history of having a previous left shoulder separation.  On examination, there was no evidence of left shoulder separation, and it was noted that the x-rays of his left shoulder were within normal limits.  Dr. Bachellor's impression was that plaintiff had a questionable strain of the left shoulder. Plaintiff was scheduled to see a physical therapist to increase shoulder-joint range of motion. (Orr. Decl. ¶ 16 & Ex. B PHS228-00448, 00449.)

On August 17, defendant Sgt. Schaull denied plaintiff's SRCJ grievance, in which plaintiff claimed he had been assaulted and denied immediate medical care.  (Opp'n Ex. W.)

14

United States District Court

For the Northern District of California

On August 20, plaintiff filed a medical request slip, complaining of continuing neck pain and stating his belief that he was being prevented from receiving medical care because of medical staff's desire to protect the SRCJ personnel who had assaulted him.  (Ex. B PHS228-00503.

The next day, August 21, plaintiff was seen by the physical therapist, Rodney Silva ("Silva").  Plaintiff complained of left shoulder pain but did not report any problem with his neck.  Silva's assessment was that plaintiff had sprained the ligament in his shoulder.  The plan was for plaintiff to increase range of motion through self-stretching and to return on August 29.  (Orr Decl. ¶ 17 & Ex. B PHS228-00448.)

The next day, August 22, plaintiff was seen at the medical clinic by Dr. Horatio Campos.  Plaintiff claimed to have been beaten and to have sustained injuries to his left shoulder and neck.  Dr. Campos's assessment was that plaintiff had a strain of the cervical `spine and left shoulder.  Dr. Campos ordered cervical spine and lateral shoulder x-rays and prescribed Darvocet, a pain medication.  (Orr Decl. ¶ 18 & Ex. B PHS228-00441.)  The x-rays were taken the next day, on August 23, and showed no abnormality.  (Orr Decl. ¶ 18 & Ex. B PHS228-00496.)

On September 4, plaintiff was seen again by Silva, the physical therapist.  Plaintiff complained of increased pain from his stretching exercises.  Silva's evaluation was that plaintiff had pain on palpation to the distal end of the clavicle.  Plaintiff informed Silva that he was scheduled to have a Mumford procedure, a surgery to remove the end of the clavicle.  Silva discharged plaintiff from further physical therapy at that time.  (Orr Decl. ¶ 19.)

On September 11, plaintiff declined to be seen at the eye clinic, stating he no longer was having blurred vision.  (Orr Decl. ¶ 20 & Ex. B PHS228-00436.)

On September 28, plaintiff was seen by the optometrist.  Plaintiff reported that he had experienced mild fuzziness in his vision in August, but that such condition had improved and that he no longer had double vision.  The optometrist's impression was that plaintiff likely had mild macular edema in August.  The plan was for plaintiff to return to the clinic in eight weeks.  The prognosis was favorable.  (Orr Decl. ¶ 22 & Ex. B PHS228-0045.)

1

2.  <u>Analysis</u>

2

a.  <u>Alameda County Defendants</u>

3      Plaintiff claims that after he pushed the intercom for medical assistance after having

4 been assaulted on August 8, SRCJ personnel did not timely respond to his need for medical

5 care and thereafter failed to ensure he was properly treated for the injuries he sustained.

6 Plaintiff's contentions are unsupported by the evidence.

7      To support his allegation that he was assaulted and attempted to summon medical care

8 at approximately 4:30 p.m. on August 8, plaintiff has submitted a copy of a disciplinary

9 report filed by deputy E. Thibodeaux on that same date, reporting that at 4:20 p.m. plaintiff

10 would not return to his cell after being ordered by Thibodeaux to do so and, when plaintiff

11 began to walk away, Thibodeaux grabbed the left shoulder of plaintiff's shirt and escorted

12 him to his cell.  (Opp'n Ex. O.)  The report, however, substantiates neither plaintiff's

13 assertion that he was assaulted nor that he attempted to summon medical help.  Further,

14 assuming such assertions are true,[8] plaintiff has presented no evidence to show that any SRCJ

15 official actually heard and ignored his request for medical attention made via the intercom, or

16 that the failure of SRCJ personnel to respond to his cell resulted from deliberate indifference

17 to his need for medical care.

18      Additionally, plaintiff's evidence shows that on the same date plaintiff allegedly was

19 assaulted, defendant Deputy Barrosa brought plaintiff a sick call slip and defendant

20 Technician Bryan told plaintiff that Bryan had called PHS to ensure that plaintiff would be

21 seen at sick call the following day.  (SAC ¶ V(C) at 4:6-8, 13-19, 22-26, 5:1-2.)

22      Further, the undisputed evidence shows that after plaintiff filed his SRCJ grievance on

23 August 8, complaining he had been assaulted and needed immediate medical care, the

24 grievance was investigated by Sgt. Schaull, who determined from plaintiff's PHS medical

25 records that two hours after the alleged assault plaintiff had been seen by a nurse who noted

26

27 _____

28      [8]Plaintiff's SAC is verified; consequently, his factual allegations contained therein
constitute admissible evidence.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   no outward signs of trauma and found plaintiff talkative, alert and oriented.  (Opp'n Ex. W.)

2   Additionally, there is no evidence suggesting plaintiff suffered any injury due to the alleged

3   delay in his being seen by medical personnel.  Specifically, when plaintiff was seen by a

4   doctor the day after the assault he was cleared to go to his cell, and subsequent x-ray results

5   for injury were negative.  (Schaull Decl. ¶¶ 4-7.)

6          Based on the above, the Court finds plaintiff has failed to raise a triable issue of fact

7   with respect to whether any SRCJ defendant acted with deliberate indifference to plaintiff's

8   serious medical needs in connection with plaintiff's efforts to obtain medical care after

9   allegedly having been assaulted on August 8.

10                          b.   PHS Defendants

11          Plaintiff claims the PHS defendants acted with deliberate indifference to his serious

12   medical needs by failing to properly treat the head and shoulder injuries he suffered after the

13   alleged assault on August 8.  The undisputed evidence, however, shows no deliberate

14   indifference.  In particular, sets of x-rays were ordered in response to plaintiff's complaints

15   of shoulder and head pain, but no evidence of any significant abnormality was found.

16   Additionally, medical staff was alert for signs of a serious head injury and followed up on

17   plaintiff's complaints of double vision, but no evidence supported a diagnosis of a serious

18   head injury.

19          Specifically, the evidence shows the following: within two hours after he was injured,

20   plaintiff was evaluated in his cell by Nurse Reyes, who saw no sign of a condition requiring

21   emergency treatment or evaluation and put plaintiff on the sick call list for the next day; two

22   days after plaintiff was injured he was seen by Dr. Pajong who examined plaintiff, saw no

23   signs of serious injury, prescribed Vicodin, and ordered x-rays of plaintiff's skull and left

24   shoulder; three days after plaintiff was injured he was seen by medical staff for complaints of

25   double vision and scheduled for a return visit in three days; in the week after plaintiff was

26   injured he was seen for a follow-up visit and referred to the eye clinic, had x-rays taken of his

27   skull and shoulder, had the x-rays reviewed and saw an orthopedist; in the second week after

28   he was injured plaintiff was seen by a physical therapist, was prescribed pain medication and

1  had x-rays taken that showed no abnormality; and in the month following plaintiff's injury,

2  plaintiff was again seen by the physical therapist, declined to go to the eye clinic for his

3  complaints of double vision, and subsequently saw an optometrist, who determined plaintiff

4  had mild swelling of the eye, a condition not requiring further treatment.

5       In sum, the undisputed evidence shows plaintiff was extensively evaluated and treated

6  by PHS nursing staff, staff doctors, the orthopedic doctor, the physical therapist and the

7  optometrist.  At most, plaintiff has shown that he did not agree with the treatment he

8  received.  "A difference of opinion between a prisoner-patient and prison medical authorities

9  regarding treatment does not give rise to a § 1983 claim."  Franklin v. Oregon, 662 F.2d

10  1337, 1344 (9th Cir. 1981).  Accordingly, the Court finds plaintiff has failed to raise a triable

11  issue as to whether the PHS defendants were deliberately indifferent to plaintiff's serious

12  medical needs following the injury suffered by plaintiff on August 8.

13       C.      Treatment Between September 11 and November 7, 2007

14            1.      Background

15       Plaintiff claims he experienced back pain, chest pain and difficulty breathing after

16  being assaulted by a deputy at around 9:00 a.m. on September 11.  He claims he tried to

17  summon medical attention, but the intercom button in his cell was not working, and medical

18  attention was not provided until September 14.  Thereafter, he alleges, he was not seen by

19  doctors between September 16 and October 31, despite submitting many medical request

20  slips and filing many grievances regarding back and shoulder pain, headaches and dizziness.

21  (SAC ¶ V(D) at 5:9-28).

22       The evidence submitted by the parties in support of and opposition to the motions for

23  summary judgment shows the following:

24       On September 11, at 10:20 a.m., plaintiff was seen by Nurse Mastroianni, complaining

25  that a previous injury to his left shoulder had been aggravated when a deputy handcuffed him

26  that morning.  He also complained that he had been having diarrhea for two days.

27  Mastroianni ordered x-rays of plaintiff's left shoulder and prescribed Pepto-Bismol and

28  Flexeril, a muscle relaxant.  She instructed plaintiff to report to medical staff if the diarrhea

1   continued.  (Orr Decl. ¶ 20 & Ex. B PHS228-00419, 00436.)

2        Two days later, on September 13, an x-ray was taken of plaintiff's left shoulder.  It

3   showed no abnormality.  (Orr Decl. ¶ 20 & Ex. B PHS228-00495.)

4        Plaintiff was seen again by Nurse Mastroianni the following day, September 14.  He

5   reported his diarrhea had resolved.  He complained of increased lower back pain and that

6   non-steroidal pain medications upset his stomach.  After examining plaintiff, Nurse

7   Mastroianni assessed his condition as a lumbar strain.  She prescribed analgesic balm for the

8   lumbar spine area twice a day and for plaintiff to follow up as needed.  (Orr Decl. ¶ 21 & Ex.

9   B PHS228-00417, 00435.)

10       On September 22, plaintiff filed a grievance with SRCJ officials, complaining that he

11  had submitted a call form on September 16 but hadn't been seen for medical care until

12  September 19.  (Opp'n Ex. DD.)  Sgt. Molloy investigated plaintiff's complaints by asking

13  PHS to respond.  On September 28, PHS responded, stating that plaintiff's most recent

14  examination and x-ray results were negative for injury, and that plaintiff had been taken off

15  all pain medications and prescribed an analgesic balm.  (Molloy Decl. ¶ 16 & Ex. E.)

16  Plaintiff's SRCJ grievance claiming inadequate care subsequently was denied.  (Opp'n Ex.

17  DD-2.)

18       On September 24, plaintiff was seen by defendant Dr. Harold Orr ("Dr. Orr"), who

19  had been contacted by plaintiff's mother, a former patient of Dr. Orr, and asked to look in on

20  plaintiff.  Dr. Orr saw plaintiff briefly, reviewed plaintiff's records, and called plaintiff's

21  mother and told her that plaintiff was being followed and treated appropriately by medical

22  staff.  Dr. Orr did not enter a progress note because, as the medical director, he oversees the

23  treatment of many inmates and does not enter progress notes unless there is a specific reason

24  to do so, such as altering the care regimen.  Dr. Orr did not schedule an appointment to see

25  plaintiff the following day, as plaintiff did not need any immediate treatment at the time and

26  it was appropriate for plaintiff to be seen in the regular course of scheduled follow-ups.  (Orr

27  Decl. ¶ 24.).

28       On September 28, plaintiff was seen by the optometrist for his previously scheduled

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    appointment.  (Orr Decl. ¶ 22 & Ex. B PHS228-0045.)

2        On October 15, plaintiff filed a grievance with SRCJ officials, complaining he had

3    been denied medical attention by the housing nurse.  The grievance was denied on

4    October 20 because the housing nurse had determined plaintiff's complaints were not an

5    emergency and he was scheduled for a follow-up appointment pursuant to the normal course

6    of scheduling.  (Orr Decl. ¶ 24, Opp'n Ex. GG.)

7        On October 23, plaintiff obtained an order from the superior court, directing that

8    plaintiff be seen for complaints for migraines and back pain that he had brought to the

9    attention of the court.  The next day, the PHS nurse noted plaintiff's chart was not available

10   and rescheduled an appointment for plaintiff with the nurse practitioner or doctor once the

11   chart became available.  That same day, October 24, plaintiff filed another SRCJ grievance,

12   complaining he was not being provided with adequate medical care, including treatment for

13   his shoulder pain.  Plaintiff's grievance was denied on the ground he was receiving treatment,

14   just not of the type plaintiff felt was appropriate.  (Orr Decl. ¶ 24, Opp'n Ex. KK.)

15       On October 26, plaintiff filed a grievance, complaining that PHS still had not

16   complied with the superior court's order.  (Opp'n Ex. LL.)  On October 29, plaintiff's chart

17   was available and Dr. Orr requested that plaintiff be seen by the nurse practitioner.  Plaintiff

18   could not be seen on October 30, as he was out for a court appearance.  (Orr Decl. ¶ 24.)

19       On October 31, plaintiff was seen by Nurse Mastroianni.  Plaintiff complained of

20   having headaches on the left side of his head after sustaining head trauma in August 2007.

21   He stated he had been using Motrin, but that it caused stomach upset.  He also reported

22   taking Tylenol, but stated it was not effective.  He stated he had been experiencing lower

23   back pain since September 11, and that the analgesic balm was not effective.  He also

24   complained of left shoulder pain from an old injury and stated he was supposed to have had

25   surgery in the past; he also said the pain was not responsive to physical therapy.

26   Additionally, he said that he had lost eleven pounds secondary to depression and wanted to

27   see a psychiatrist, and he complained of having a cough with yellow green sputum.  After

28   examining plaintiff, Nurse Mastroianni prescribed Baclofen, a muscle relaxant; Percogesic, a

pain medication; and Humibid, a decongestant.  Nurse Mastroianni scheduled plaintiff for a follow-up medical appointment on November 5, and noted plaintiff was scheduled for a psychiatric appointment on November 15.

On November 5, plaintiff was seen by Dr. Wilson.  Plaintiff reported a decrease in coughing.  He complained of headaches and low back pain.  Dr. Wilson referred plaintiff to physical therapy for core strengthening and flexibility exercises, and noted in the medical report that although plaintiff had multiple complaints, the examination of plaintiff was "uncompelling" (Orr Decl. ¶ 25 & Ex. B PHS228-00416, 00447), meaning, there was no objective evidence to support plaintiff's subjective complaints (Orr Decl. ¶ 25).

On November 7, plaintiff was transferred to Atascadero State Hospital ("Atascadero"). (Molloy Decl. ¶ 4.)

> 2.   Analysis
>
> a.   Alameda County Defendants

Plaintiff claims SRCJ personnel did not timely respond to his need for medical care after he was assaulted on September 11 and for lengthy periods of time thereafter.  The undisputed evidence, however, shows otherwise.

First, such evidence shows that plaintiff claims he was assaulted at approximately 9:00 a.m., and that he was seen that same day at 10:20 a.m. by Nurse Mastroianni, who ordered x-rays of plaintiff's left shoulder and prescribed a muscle relaxant and Pepto-Bismol.

Second, the undisputed evidence shows that between September 22 and October 26 plaintiff filed three SRCJ grievances, each of which Sgt. Molloy promptly investigated by asking PHS to respond, and that PHS responded that plaintiff was seen by a PHS nurse less than two hours after the incident, no signs of trauma were observed, x-rays taken two days later were negative, and PHS health care givers saw plaintiff on one other occasion in September, four other occasions in October, and once more in November.

Plaintiff also claims the SRCJ defendants acted with deliberate indifference to his serious medical needs because the intercom button in his cell was not working when he tried to summon medical help after he was assaulted.  Plaintiff, however, has presented no

United States District Court

For the Northern District of California

1   evidence that shows any SRCJ defendant either knew the intercom was broken or failed to

2   fix it in conscious disregard of a substantial risk of harm to plaintiff's health and safety.

3   Further, the undisputed evidence shows that even though the intercom button was not

4   working, plaintiff was seen by a nurse within ninety minutes of having been injured, and the

5   nurse found no objective evidence of a serious condition or injury.

6       Based on the above, the Court concludes plaintiff has failed to raise a triable issue

7   with respect to whether any SRCJ defendant acted with deliberate indifference to plaintiff's

8   serious medical needs following his alleged assault on September 11.

9   b.   <u>PHS Defendants</u>

10       Plaintiff complains the PHS defendants denied him treatment for his back and

11   shoulder pain, headaches and dizziness from September 16 until October 31, when he was

12   seen by Nurse Mastroianni.  While the evidence shows plaintiff was not seen by any PHS

13   defendant during the relevant period, plaintiff has failed to raise a triable issue with respect to

14   whether the reason for his failure to be seen was due to defendants' deliberate indifference.

15   Rather, the undisputed evidence shows that from September 16 to October 31, PHS received

16   no direct request for medical care from plaintiff.  Instead, PHS was made aware of plaintiff's

17   complaints because he filed several SRCJ administrative grievances.  Upon request from the

18   SRCJ grievance unit, PHS promptly responded that they were aware of plaintiff's

19   complaints, which were being addressed.  Additionally, within one week of PHS's receiving

20   the superior court's order for a medical report concerning plaintiff's complaints, plaintiff was

21   seen and thoroughly evaluated by Nurse Mastroianni, and five days later he was seen by Dr.

22   Wilson.[9]

23       Moreover, there is no evidence showing plaintiff suffered any harm as a result of the

24   claimed delay.  In particular, the undisputed evidence shows that prior to September 16

25

26       [9]The superior court's issuance of such order does not lead to an inference that

27   defendants acted with deliberate indifference to plaintiff's medical needs.  The undisputed evidence is that PHS often receives orders from the superior court, requesting that inmates be seen for complaints they have brought to the attention of the court at the time they appear

28   before the court.  (Orr Decl. ¶ 24.)

United States District Court

For the Northern District of California

1  plaintiff was medically evaluated on three occasions, that thereafter he was seen by Dr. Orr

2  on September 24 and by the optometrist on September 28, and that there was nothing to

3  indicate an emergency or new injury to plaintiff at any of those appointments, or at the time

4  he was seen on October 31.

5      Based on the above, the Court concludes plaintiff has failed to raise a triable issue

6  with respect to whether any PHS defendant acted with deliberate indifference to plaintiff's

7  serious medical needs following his alleged assault on September 11.

8      D.      Treatment for Back Pain Between March 19 and April 4, 2008

9          1.      Background

10     Plaintiff claims he was not seen promptly for medical care when he was transferred

11 back to SRCJ from Atascadero, and was not given pain medication for his back.

12     The evidence submitted by the parties in support of and opposition to the motions for

13 summary judgment shows the following:

14     Plaintiff returned to SRCJ from Atascadero on March 19, 2008.[10]  The transfer form

15 noted that the medications plaintiff had been taking at Atascadero, other than psychiatric

16 medications, had been prescribed on an "as needed" basis and, consequently, were not sent

17 with plaintiff when he was transferred back to SRCJ.  (Orr Decl. ¶ 26 & Ex. B PHS228-

18 00352, 00353, 00359.)

19     Upon his arrival at SRCJ, plaintiff was screened by a nurse.  The intake examination

20 showed plaintiff had reported chronic headaches and back pain.  He was prescribed Tylenol

21 650 two times a day for five days.  It was noted that plaintiff stated he had been weaning

22 himself off Seroquel, a psychiatric medication.  He was scheduled for a psychiatric

23 appointment.  (Orr Decl. ¶ 26.)

24     Twelve days later, on March 31, plaintiff filed a grievance with SRCJ officials,

25 complaining that, among other things, he had not received follow-up medical care for his

26 headaches and back pain after his return to SRCJ.  On April 2, Sgt. Molloy requested a

27

28          [10]All further dates referenced in this section are in 2008, unless otherwise noted.

United States District Court

For the Northern District of California

response from PHS concerning plaintiff's complaints.  On April 3, PHS responded that plaintiff had been prescribed Tylenol, he had not submitted any sick call request slips to PHS after his return to SRCJ, and, as of March 20, he had been refusing his psychiatric medications every day.  Also on April 3, the SRCJ grievance unit asked PHS to have plaintiff seen by medical personnel as soon as possible; PHS responded by seeing plaintiff the next day.

On April 4, plaintiff was seen by Nurse Mastroianni.  He reported a history of migraine headaches and treatment with Imitrex at Atascadero.  He also complained of low back pain for which he had received multiple treatments that were somewhat effective.  He further complained he was not receiving his psychiatric medications.  After examining plaintiff, Nurse Mastroianni was not convinced he had migraine headaches, and thought the headaches might be tension related.  Nurse Mastroianni prescribed Robaxin and acetaminophen, and referred plaintiff to the psychiatry clinic and for a physical therapy consult.   (Orr Decl. ¶ 28 & Ex. B PHS228-00235-36.).

On April 11, in further response to Sgt. Molloy's investigation of plaintiff's medical grievance, PHS informed Sgt. Molloy of plaintiff's examination by Nurse Mastroianni and that there were no findings that would warrant prescribing the pain medication plaintiff was requesting in his grievance.  (Molloy Decl. ¶ 20 & Ex. G.)

Subsequently, on April 14 and April 29, plaintiff refused to see the physical therapist.  (Orr Decl. ¶ 31 & Ex. B PHS228-00241.)

2.   Analysis

a.   Alameda County Defendants

Plaintiff's contention that the SRCJ defendants did not provide him with prompt and adequate medical attention upon his return from Atascadero is not supported by the evidence.  Rather, the undisputed evidence shows the following: subsequent to plaintiff's return to SRCJ from Atascadero on March 19, plaintiff did not communicate with SRCJ officials about alleged inadequate medical care until he filed a grievance on March 31; two days later, Sgt. Molloy investigated the grievance by requesting a response from PHS; the following day

United States District Court

For the Northern District of California

the grievance unit asked PHS to see plaintiff as soon as possible; plaintiff was seen by PHS the very next day; one week later PHS informed Sgt. Molloy of the results of plaintiff's examination, specifically, that there were no medical findings that would warrant prescribing the particular pain medication plaintiff was requesting.

Based on the above, the Court concludes there is an absence of evidence to support a finding that the SRCJ defendants acted with deliberate indifference to plaintiff's serious medical needs.

b.   <u>PHS Defendants</u>

Plaintiff's contention that the evidence shows he was not promptly seen by PHS medical staff upon his return to SRCJ, and that he was not provided the medication he had been receiving at Atascadero, is equally unavailing.  In particular, the undisputed evidence shows that on March 19, the day of plaintiff's return to SRCJ, the transfer form sent with plaintiff from Atascadero showed that the medications he reported to have been taking for his physical conditions were being taken on an "as needed basis"; that same date, he was seen by a PHS nurse who prescribed Tylenol for five days for plaintiff's complaint of headaches and back pain; as of March 31 plaintiff had not submitted any sick call slips to PHS; within one day of being notified of plaintiff's SRCJ grievance, a PHS nurse saw plaintiff, prescribed Robaxin and acetaminophen, and planned for plaintiff to be seen by the psychiatry department and to receive a physical therapy consultation; on both April 14 and 29 plaintiff refused to see the physical therapist.

Based on the above, the Court concludes plaintiff has failed to raise a triable issue as to whether the PHS defendants acted with deliberate indifference to his serious medical needs by failing to promptly see him upon his return to SRCJ and to prescribe medication for his complaints of pain.

United States District Court

For the Northern District of California

E.      Treatment Between July 15 and September 2, 2008

        1.      Background

Plaintiff complains he aggravated his back and shoulder injuries on July 15, when he was moved to a top tier bunk, and that he received inadequate medical care for his injuries because he was not provided with a medical chrono for a lower bunk and did not receive proper attention for his back and shoulder pain.  He further complains he did not receive adequate medical care for his chronic weight loss.

The evidence submitted by the parties in support of and opposition to the motions for summary judgment shows the following:

Plaintiff's medical chart does not contain any record of plaintiff's sustaining an injury on July 15.  Instead, the record reflects that on July 16, a deputy reported that plaintiff refused to go to an outside appointment for evaluation of a condition in his mouth.  The reason provided by plaintiff was that he could not move because of a disc problem he had suffered at Atascadero.  That same date, plaintiff was seen by PHS medical staff, who examined plaintiff, assessed chronic back pain, prescribed Neurontin and scheduled him to be seen at sick call.  (Orr Decl. ¶ 37 & Ex. B PHS228-00229.)

The next day, July 17, plaintiff was seen by defendant Dr. I-Fei Chen ("Dr. Chen").  (Orr Decl. ¶ 38; Chen Decl. ¶ 4.)  Plaintiff requested a chrono, specifically, a medical order for him to be placed on a lower bunk in a lower tier.  Dr. Chen examined plaintiff, who was not in acute distress.  Dr. Chen's assessment was that plaintiff had chronic low back pain, with no objective signs of any abnormality.  Dr. Chen denied plaintiff's chrono request.  She encouraged plaintiff to perform self-directed physical therapy for range of motion and strengthening.  (Decl. Dr. I-Fei Chen Supp. PHS Defs.' Mot. Summ. J. ("Chen Decl.") ¶ 8).

The next week, on July 25, Deputy Franco "unofficially" gave plaintiff a lower bunk at plaintiff's request, despite the lack of a medical order.  (SAC ¶ V(F) at 9:1-4.)

On July 31, plaintiff was seen by Dr. Chen pursuant to a superior court order to address plaintiff's back and left shoulder pain.  Dr. Chen noted in the medical chart that she had already addressed plaintiff's back pain on July 17.  Additionally, she noted that when she

26

United States District Court

For the Northern District of California

attempted to examine plaintiff's shoulder, she was unable to do so because plaintiff refused to move his left arm or let her passively move his arm.  He also refused to sign a release of responsibility and said he wanted to file a grievance.  (Orr Decl. ¶ 40; Chen Decl. ¶ 5).

On August 5, Sgt. Molloy asked PHS to respond to an SRCJ grievance plaintiff had filed, in which plaintiff complained of inadequate medical attention.  The investigation showed that the last sick call slip PHS had received from plaintiff was dated June 30, and that PHS had received no sick call slips from plaintiff complaining of a re-injury to his shoulder; additionally, plaintiff had been seen in sick call on five occasions after June 26.  PHS further advised Sgt. Molloy there was no medical indication for further x-rays and that medical records from Atascadero did not support plaintiff's claims of a back and shoulder injury other than a complaint of shoulder pain, which had been treated with Tylenol.  (Molloy Decl., ¶¶ 22-23 & Ex. H.)

Thereafter, plaintiff obtained another superior court order, dated August 26, for evaluation of his shoulder and back.  The next day, Dr. Chen responded to the superior court, expressing her frustration with what she described as plaintiff's continued attempts to manipulate the medical staff.  In particular, Dr. Chen explained that she had examined plaintiff's back, which was normal, and that he refused to allow her to assess his shoulder. She stated it would be a disservice to plaintiff to enable his behavior, and she requested the court be judicious in its further issuance of such orders.  (Orr Decl. ¶ 41; Chen Decl. ¶ 6).

That same date, August 27,  plaintiff filed a SRCJ grievance, complaining he needed to be seen by another doctor.  Sgt. Molloy asked PHS to respond; two days later, PHS informed Sgt. Molloy that plaintiff had been seen by a nurse practitioner and two doctors on several occasions, there was no medical indication that a second opinion was required, and there was no medical need for a lower tier, lower bunk chrono.  (Molloy Decl. ¶¶ 24-25 & Exs. I & J.)

On September 2, plaintiff was seen by Dr. Wilson.  Plaintiff claimed he had suffered a shoulder separation in September 2006 and surgery was pending.  Dr. Wilson's assessment was left shoulder separation with joint pain, low back pain and decreased weight.  Dr. Wilson

United States District Court

For the Northern District of California

ordered laboratory testing, a physical therapy consultation, analgesic balm, Ensure and Percogesic.  He also approved a lower bunk chrono, and ordered plaintiff's weight to be checked at regular intervals.  (Orr Decl. ¶ 42.)

Thereafter in 2008, plaintiff was seen as follows: on September 18 by Dr. Chen; on October 1 by Dr. Wilson, who ordered an orthopedic consult for plaintiff's complaints of shoulder and back pain; on October 2 for physical therapy; on October 16 in the orthopedic clinic for possible treatment of his shoulder pain with steroid injections; and on December 31 by a PHS nurse, at which time anti-inflammatory medication was prescribed and x-rays of plaintiff's shoulder were ordered.   (Chen Decl. ¶ 7; Orr Decl. ¶¶ 44, 46, 49, 52.)  On January 6, 2009, plaintiff was seen twice by Dr. Magat, pursuant to a court order for evaluation of pain in plaintiff's left shoulder, possible rotator cuff injury and back pain with a possible degenerative disc.  Dr. Magat noted that plaintiff had refused the previously ordered x-rays of plaintiff's shoulder and neck, and that plaintiff would not allow Dr. Magat to examine his left shoulder.  On January 15, plaintiff refused to sign a request-for-information form to allow Dr. Magat to receive his records from Kaiser regarding his left shoulder.  (Orr Decl. ¶¶ 52-53.)

       2.   <u>Analysis</u>

       a.   <u>Alameda County Defendants</u>

Plaintiff claims he received constitutionally inadequate medical care between July 15 and September 2, 2008, because he was not timely provided a medical chrono for a lower bunk for his back and shoulder pain, was not seen often enough by medical staff for said pain, and was not treated for his chronic weight loss.  The undisputed evidence shows that no SRCJ defendant acted with deliberate indifference to plaintiff's medical needs in such regard.

First, plaintiff has presented no evidence that any SRCJ defendant acted with deliberate indifference to his complaints regarding his bunk.  Rather, the undisputed evidence shows: plaintiff first complained of his injury to a SRCJ deputy on July 16; he was seen the next day by Dr. Chen, who assessed plaintiff as suffering from chronic back pain and

United States District Court

For the Northern District of California

1  declined to write a lower bunk chrono; he was "unofficially" given a lower bunk a week later

2  by SRCJ deputy Franco; he subsequently filed a grievance that was investigated by Sgt.

3  Molloy; five days later he was seen by Dr. Wilson, who prescribed a lower bunk chrono.

4       Second, with respect to plaintiff's complaint of inadequate medical follow up, the

5  undisputed evidence shows that during the relevant time period plaintiff filed two grievances,

6  and within two days of each such filing Sgt. Molloy had asked for and received from PHS

7  information showing that plaintiff had been seen several times by PHS medical staff and his

8  medical concerns were being addressed.  Although plaintiff complained he was not receiving

9  appropriate care from PHS medical staff, the information obtained by Sgt. Molloy showed

10  that while plaintiff did not agree with the diagnoses and treatment he was receiving from

11  PHS, he in fact was receiving a substantial amount of care for his complaints from numerous

12  medical providers.

13       Based on the above, the Court concludes there is an absence of evidence from which it

14  could be found that any of the SRCJ defendants acted with deliberate indifference to

15  plaintiff's serious medical needs.

16              b.    <u>PHS Defendants</u>

17       Plaintiff's complaint of deliberate indifference by the PHS defendants also fails. With

18  respect to plaintiff's contention that Dr. Chen wrongly refused to provide him with a lower

19  bunk chrono, there is no evidence to suggest that Dr. Chen's evaluation of plaintiff's medical

20  needs amounted to deliberate indifference.  Rather, the evidence shows that at plaintiff's first

21  appointment with Dr. Chen, she thoroughly examined plaintiff and determined he had

22  chronic lower back pain that did not require a lower bunk chrono, and that at plaintiff's

23  subsequent appointments with Dr. Chen, plaintiff did not allow her to examine his shoulder

24  or back.  Additionally, plaintiff subsequently was evaluated at physical therapy and by an

25  orthopedist, and no significant shoulder condition was diagnosed.  Further, while Dr. Wilson

26  eventually approved plaintiff for a lower bunk on September 2, his assessment of plaintiff did

27  not reveal any serious back problem that had been ignored by Dr. Chen.  Consequently, Dr.

28  Wilson's decision to provide plaintiff with the lower bunk chrono evidences no more than a

United States District Court

For the Northern District of California

difference of medical opinion about the treatment of plaintiff's chronic lower back pain.  A showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. See Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004).

Plaintiff also complains that he did not receive proper care for his chronic weight loss. The undisputed evidence shows, however, that no PHS employee acted with deliberate indifference to plaintiff's weight problem.  Rather, such evidence shows that from the time of plaintiff's arrival at SRCJ in April 2007 his weight had been monitored regularly, the laboratory tests ordered by Dr. Wilson in September 2008 showed no abnormality, plaintiff was prescribed dietary supplements, and, by October 1, Dr. Wilson concluded plaintiff was showing slow weight gain and recommended he remain on dietary supplements and continue to be monitored.

Based on the above, plaintiff has failed to raise a triable issue with respect to whether any PHS defendant acted with deliberate indifference to plaintiff's serious medical needs.

F.   Conclusion

Plaintiff has not shown that any SRCJ or PHS defendant acted with deliberate indifference to plaintiff's medical needs on any occasion set forth in the SAC.  Specifically, the undisputed evidence demonstrates that defendants did not  disregard plaintiff's medical needs, but, rather, that they investigated and responded to plaintiff's medical complaints, and provided plaintiff with a considerable amount of medically acceptable care.  Accordingly, summary judgment will be granted in favor of the SRCJ and PHS defendants on each of plaintiff's medical claims.

VI.   Plaintiff's Mental Health Care Claims

Plaintiff alleges two claims of constitutionally inadequate mental health care against the CJMH defendants.  First, plaintiff claims he was not prescribed appropriate anti-psychotic drugs when he told CJMH physicians and CJMH Director Swafford that he was suffering from depression, paranoia, fear, and hearing voices, and that the drugs being prescribed did not help.  (SAC ¶ VI(A) at 3:11-20.)  Second, he claims he received

1   inadequate mental health treatment between July 13 and August 27, 2007, and again between

2   September 3 and October 27, 2008.  (SAC ¶ VI(A) at 4:13-21.)  He also claims CJMH and

3   SRCJ supervisory officials failed to act to ensure that he receive adequate mental health care.

4       A.   Background

5       The evidence submitted by the parties in support of and opposition to the CJMH

6   defendants' motion for summary adjudication shows the following:

7       Plaintiff arrived at SRCJ on March 10, 2007.[11]  That same date, an initial mental

8   health screening was conducted by CJMH.  Based on plaintiff's depiction of certain

9   symptoms, a provisional assessment of schizophrenia was made and he was scheduled for a

10  follow-up appointment with CJMH for a formal assessment.  (See Documents Filed Under

11  Seal Supp. Alameda Cty. Defs.' Mot. Summ. J. Ex V at 1-2.)

12      On March 14, at the formal assessment interview, plaintiff stated he suffered from

13  auditory hallucinations and had a history of psychiatric treatment going back to 1985.  He

14  further stated that prior to his incarceration he had been taking two anti-psychotic

15  medications, Seroquel and Mellaril, as well as the anti-depressant Prozac, but had taken no

16  medication in the past several weeks because he ran out.  Dr. Rosenthal, a psychiatrist,

17  diagnosed plaintiff as schizophrenic with paranoid tendencies, and recommended he be

18  housed in the mental health unit.  (Ex. V at 3-6.)

19      Dr. Rosenthal prescribed a thirty-day course of Risperdol, an anti-psychotic

20  medication that plaintiff stated had helped him in the past, and Prozac.  (Id.)  Although, as

21  noted, plaintiff stated he had been taking Seroquel and Mellaril prior to his incarceration,

22  those medications were not prescribed for plaintiff.  Specifically, Seroquel is an anti-

23  psychotic that is heavily abused in correctional facilities because inmates grind it up and

24  snort it as a substitute for heroin.  Mellaril is an anti-psychotic with dangerous side effects,

25  including extreme sedation and urinary retention.  Because there are other anti-psychotics

26  that are better and safer alternatives to Seroquel and Mellaril, those medications are not

27

28      [11]All further dates referenced in this section are in 2007, unless otherwise noted.

United States District Court

For the Northern District of California

available for CJMH doctors to prescribe.  (Rosenthal Decl. ¶¶ 9-11; Thomas Decl. ¶ 13.)

Further, Dr. Rosenthal saw no medical basis for the use of either Seroquel or Mellaril.

(Rosenthal Decl. ¶ 12.)  Plaintiff was scheduled to return to see Dr. Rosenthal on April 11.

On March 22, plaintiff was seen by Dr. Russell, a rehabilitation therapist.  It was

determined that plaintiff should keep taking his medication and that he would be reevaluated

in a week.  (Ex. V at 9-10.)

Plaintiff refused to go to his March 28 follow-up appointment with Dr. Russell, and

was rescheduled to see a psychiatrist on April 11, on which date plaintiff was "not seen."

(Ex. V at 11.)[12]  Dr. Rosenthal nevertheless continued plaintiff's medications and scheduled

him for a return appointment on April 25.  (Ex. V. at 11.)

On April 25 plaintiff refused to attend his appointment; he was scheduled to return on

April 27.  Plaintiff also refused to attend the April 27 appointment.  Because his medications

expired that same date, Dr. Rosenthal renewed the prescriptions, in order that plaintiff could

continue to receive treatment.  (Ex. V at 14-15.)  He scheduled plaintiff to return on May 4.

Plaintiff did not make his May 4 appointment because he was out for a court

appearance.  He was rescheduled for May 9, but refused to attend the appointment.  He was

rescheduled for May 11.  (Ex. V at 16.)

On May 11, plaintiff saw Dr. Rosenthal.  He complained of auditory hallucinations

and depression.  He requested that he be prescribed Seroquel; Dr. Rosenthal explained that

Seroquel was not available.  Plaintiff agreed to an increase in the dosages of Risperdol and

Prozac to better control his symptoms.  He was scheduled for a follow-up appointment in one

month, on June 15.  (Ex. V at 17-18.)

Plaintiff refused to attend the June 15 appointment.  Dr. Rosenthal continued

plaintiff's medications and rescheduled him for June 22.  On June 22, plaintiff met with Dr.

Rosenthal and complained of auditory and visual hallucinations.  He told Dr. Rosenthal he

had been treated at Kaiser with Risperdol and Haldol, an anti-psychotic, which helped.  Dr.

_____

[12]The medical records do not reflect the reason why plaintiff was not seen.  (See id.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Rosenthal agreed to add Haldol to plaintiff's treatment regimen, and scheduled plaintiff to return in one month, on July 20.  (Ex. V at 20-21.)

On July 12, Dr. Russell, the rehabilitation therapist, saw plaintiff after plaintiff requested medication to restore his competence to participate in court proceedings.  At that appointment, plaintiff complained of auditory and visual hallucinations.  Dr. Russell scheduled plaintiff to meet with herself and Dr. Rosenthal, the psychiatrist, the next day.  At that next appointment, plaintiff claimed to have several identities.  Dr. Rosenthal was unable to determine if plaintiff was delusional and/or had multiple personalities.  He continued plaintiff's medications, increased the dosage of Haldol, and scheduled plaintiff to return on August 8.  (Ex. V at 24-28.)

On July 17, five days after plaintiff's meeting with Drs. Russell and Rosenthal, plaintiff was seen in his cell by CJMH Director Swafford, after complaining he was not getting the medications he needed, specifically, Seroquel and Mellaril.  Director Swafford reviewed plaintiff's symptoms and medications and determined that his current medications were appropriate; it was unclear to Director Swafford, however, whether plaintiff was taking his medications as prescribed.  She wrote in her notes that plaintiff would be going to Atascadero for a competency evaluation.  (Ex. V at 29.)

Three days later, plaintiff refused to attend his scheduled follow-up appointment with Dr. Rosenthal.  He was rescheduled for July 27; on that date, however, he was away at court.  He was rescheduled for August 3, at which time he saw Dr. Russell.  Plaintiff complained the medications were not working well enough.  Dr. Russell told plaintiff she was leaving CJMH and would schedule him to see Dr. Rosenthal and a new therapist the next week, on August 8.  (Ex. V at 30.)

On August 8, plaintiff refused to be seen for a morning appointment and was placed on the afternoon schedule as an add-on; the schedule change, however, was not noted for the transporting deputy, and plaintiff missed his appointment  As his medications were set to expire on August 12, his medications were extended until August 22, when he was scheduled to see the psychiatrist and therapist.  (Ex. V at 31-32.)

United States District Court

For the Northern District of California

On August 15, CJMH was notified by Captain Wilkinson that Sheriff Ahern had received complaints from plaintiff that plaintiff was not receiving adequate mental health treatment.  (Ex. V at 33.)

On August 22, plaintiff was seen by Dr. Rosenthal.  He complained of auditory hallucinations and depression.  Dr. Rosenthal increased plaintiff's anti-psychotic medications, and scheduled plaintiff to return on September 14.  (Ex. V at 34-35.)

The next day, August 23, Dr. Rosenthal determined that plaintiff could be returned to housing in the general population, because he had no behavioral or problematic symptoms that required him to remain in the mental housing unit.  Additionally, on that same date, plaintiff's therapist, Thomas Resburg ("Resburg"), provided a primary diagnosis of malingering, based on marked discrepancies between plaintiff's reported symptoms and CJMH medical staff's objective findings, plaintiff's lack of cooperation with a diagnostic interview, and secondary gain to plaintiff should he be found incompetent to stand trial. (Rosenthal Decl. ¶ 16 & Ex. V at 36-37.)

Approximately two weeks later, on September 14, plaintiff was seen at a follow-up appointment with Dr. Rosenthal.  Plaintiff reported the auditory hallucinations had decreased and agreed to continue with his medications.  He was scheduled to return in one month, on October 16.  (Ex. V at 38-19.)

Thereafter, plaintiff filed a grievance, complaining he was not receiving proper medication.  At plaintiff's October 16 appointment, a doctor reviewed plaintiff's medical record and determined that the dose of Risperdol written in plaintiff's medical chart was not the same dose plaintiff had been prescribed.  The dose was increased to the correct amount and plaintiff was scheduled to return in one month, on November 15.  (Ex. V at 40-41.)

 On November 7, plaintiff was transferred to Atascadero, and did not return to SRCJ until March 19, 2008.[13]  Upon his return, plaintiff had an initial intake screening by CJMH. At that time, plaintiff said he had been prescribed Seroquel at Atascadero, but had been

---

[13]All further dates referenced in this section are in 2008, unless otherwise noted.

United States District Court

For the Northern District of California

1    tapering himself off and hadn't taken any for the past two months.  He reported no auditory

2    hallucinations, and that he was willing to resume Prozac.  Later that day, plaintiff was seen

3    by Dr. Rosenthal, who noted plaintiff was non-delusional and prescribed Prozac for him.  A

4    return appointment was scheduled for April 11. (Ex. V at 44-50.)

5         On April 1, in response to a request from the superior court with respect to plaintiff's

6    mental health status, plaintiff was seen by therapist Resburg.  Plaintiff complained that he

7    needed more medication and that he wanted the medication he had been receiving at

8    Atascadero.  Resburg scheduled plaintiff to see the psychiatrist in two days.  (Ex. V at 52-

9    53.)  On April 3, plaintiff was seen by Dr. Thomas; plaintiff asked to be prescribed Seroquel,

10   Risperdol, and Prozac, as had been prescribed at Atascadero.  He reported auditory and

11   visual hallucinations, and said he had been diagnosed as schizophrenic for the past twenty-

12   five years.  Upon further questioning by Dr. Thomas, however, plaintiff would not say

13   specifically how his hallucinations were manifested.  Plaintiff then told Dr. Thomas that if

14   Dr. Thomas would not prescribe him the medications he wanted, he would not talk to Dr.

15   Thomas.  Dr. Thomas diagnosed plaintiff as having a personality and impulse control

16   disorder and concluded there was "[n]o need for treatment with typical antipsychotics," but

17   that mood stabilizers might offer some benefit.  Plaintiff did not want to discuss the matter

18   further.  (Ex. V at 54-55.)

19        On April 22, plaintiff's Prozac prescription expired.  Although no return appointment

20   had been scheduled for plaintiff, Dr. Thomas, on that same date, renewed plaintiff's

21   prescriptions and planned to go and see plaintiff.  On April 30, Dr. Thomas went to

22   plaintiff's housing unit to see him.  Plaintiff again told Dr. Thomas he had been diagnosed as

23   a paranoid schizophrenic for the past twenty-five years, and that he suffered from auditory

24   and visual hallucinations.  As with their previous visit, however, plaintiff refused to answer

25   further questions from Dr. Thomas.  Dr. Thomas wrote in the medical chart that he would

26   attempt to reevaluate plaintiff in the following month, on May 27.  (Ex. V at 58-60.)  Also on

27   April 22, plaintiff was seen by therapist Resburg for a court-ordered evaluation.  Resburg

28   wrote that plaintiff continued to demand the medications he had received at Atascadero, but

United States District Court

For the Northern District of California

that Resburg saw no overt indication of psychotic disorders.  Plaintiff's Prozac prescription was renewed.  (Ex. V at 61.)

On May 13, plaintiff was moved to the mental health unit because of a conflict with a housing deputy.  (Ex. V at 63.)  The next day, plaintiff was seen by Dr. Thomas after plaintiff reported in court that he had attempted suicide by trying to hang himself in his cell the night before.  Dr. Thomas investigated plaintiff's report, but found no objective evidence to support plaintiff's account.  (Ex. V at 65.)

The next day, May 15, CJMH Director Swafford interviewed plaintiff's cellmate, whom plaintiff said had witnessed the suicide attempt.  Plaintiff's cellmate stated plaintiff had not tried to hang himself or made any other suicidal gestures.  (Ex. V at 66.)

The following day, May 16, CJMH responded to a request from the superior court for a mental health evaluation of plaintiff as well as an explanation as to whether plaintiff was receiving different medication than he had received at Atascadero and, if so, the reasons therefor.  The CJMH evaluator wrote that plaintiff was denying any auditory or visual hallucinations at the time, was not requesting anti-psychotic medications, and was asking to be moved back to the general population.  (Ex. V at 67-68.)

On May 28, plaintiff was seen by Dr. Thomas.  Plaintiff stated he was doing well but was depressed.  He made no delusional statements.  Dr. Thomas continued plaintiff's Prozac, but found no objective evidence of psychosis to support prescribing anti-psychotic medication.  Dr. Thomas scheduled a return appointment for plaintiff for June 18.  The day after plaintiff's appointment with Dr. Thomas, therapist Resburg approved plaintiff for return to the general population.  (Ex. V at 71-73.)

Resburg was unable to see plaintiff on June 18, and rescheduled the appointment for June 24.  On June 24, plaintiff did not appear for his appointment because he was away at court.  (Ex. V at 75.)  Plaintiff saw Resburg on June 27, and complained his symptoms were not being treated.  He stated both that he was and was not having auditory hallucinations.  He also stated he was not taking his medication.  He asked to meet with a doctor to discuss his medication.  (Ex. V at 76-77.)

United States District Court

For the Northern District of California

On July 7, plaintiff saw Dr. Thomas.  He complained of anxiety and constant anger.  Dr. Thomas increased plaintiff's Prozac prescription, and prescribed Risperdol, Benadryl, and Trileptal, a mood stabilizer.  (Ex. V at 78-80.)

On July 24, plaintiff had another appointment with Dr. Thomas.  Plaintiff reported he was doing better; he was still depressed, but had decreased anxiety and no psychotic symptoms.  Plaintiff's Prozac dose was increased and his other medications were continued.  He was scheduled for a return appointment on August 28.  (Ex. V at 81-82.)

Plaintiff was not seen on August 28 because Dr. Thomas was not available.  Plaintiff was rescheduled and saw Dr. Thomas on September 8.  Plaintiff reported hearing voices and having anxiety, but showed no overt signs of delusions or psychiatric disorders and reported no acute psychiatric issues.  Dr. Thomas increased plaintiff's Risperdol dosage and scheduled a return visit for October 13.  (Ex. V at 83-84.)

Dr. Thomas was unable to see plaintiff on October 13 and rescheduled the appointment for October 27.  On that date, plaintiff reported he was depressed and anxious, and still hearing voices.  He did not report delusional behavior.  Dr. Thomas increased plaintiff's Prozac and Trileptal dosages and scheduled a review for December 1.  (Ex. V at 87-88.)

Dr. Thomas saw plaintiff on December 1, at which time plaintiff said he was hearing voices and asked for Seroquel.  Upon evaluating plaintiff, however, Dr. Thomas determined plaintiff did not have psychotic symptoms and told plaintiff, as he had before, that no anti-psychotics would be prescribed, that plaintiff already was receiving a higher dose of Risperdol than is typically prescribed as an adjunct to an anti-depressant for anxiety, and that there was no indication for change.  Dr. Thomas concluded: "Patient is clearly not psychotic and [is] attempting to manipulate system to receive medication he does not need on clinical grounds.  No medication changes at this time."  (Ex. V at 90.)  Plaintiff was scheduled to

United States District Court

For the Northern District of California

1    return January 5, 2009.[14]

2           Plaintiff did not keep his January 5 appointment.  He was seen again by Dr. Thomas

3    on January 26, at which time Dr. Thomas diagnosed plaintiff as malingering and told plaintiff

4    that the doses of medication he was receiving were excessive in relation to the objective

5    evidence of illness plaintiff was displaying.  (Ex. V at 94-95.)

6           Plaintiff refused to attend follow-up appointments with Dr. Thomas on March 9,

7    April 6, and April 28.  In the interim, plaintiff's prescriptions expired.  When Dr. Thomas

8    saw plaintiff again, in May 2009, plaintiff stated the prior medications were effective; Dr.

9    Thomas restarted the medications, but told plaintiff such medications would not be renewed

10   if plaintiff could not be seen by medical staff.  When plaintiff was seen in July 2009 by

11   Thomas, he refused to speak or be evaluated.  In August 2009, plaintiff refused to attend two

12   scheduled appointments; consequently, his expired medications were not renewed.  When

13   plaintiff next saw Dr. Thomas, at the end of August 2009, Dr. Thomas agreed to prescribe a

14   higher dose of Risperdol for plaintiff, even though in Dr. Thomas's medical opinion the dose

15   was too high.  From that time through February 2010, plaintiff had his medications adjusted

16   by Dr. Thomas, and also refused to see Dr. Thomas on two occasions.   (Ex. V at 96-100,

17   105-107, 114-120.)            B.      Analysis

18              1.       Failure to Prescribe Appropriate Anti-Psychotic Medications

19          Plaintiff's first claim is that the failure of CJMH medical staff to prescribe him

20   Seroquel and/or Mellaril constituted deliberate indifference.

21          As a threshold matter, it is undisputed that neither plaintiff's therapist, Thomas

22   Resburg, nor CJMH Director Swafford was authorized to prescribe psychiatric medication.

23   Consequently, plaintiff's claim must be limited to his prescribing psychiatrists, Dr. Rosenthal

24   and Dr. Thomas.  Plaintiff's disagreement with his psychiatrists about what medications he

25   should have been prescribed, however, does not amount to deliberate indifference to

26

27   _____

28          [14]In the SAC, plaintiff alleges the final occasion on which he was not given
     appropriate treatment was the December 1, 2008 visit.  (SAC ¶ VI(A) at 4:22-28.)

38

United States District Court

For the Northern District of California

1  plaintiff's mental health needs.  Rather, the undisputed evidence shows that plaintiff was

2  prescribed medication in accordance with the best medical judgment of the doctors treating

3  him, and that his symptoms improved on the prescribed medical regimen.  Further, plaintiff's

4  own failure to attend follow-up appointments with the doctors and failure to consistently take

5  his medications undermines his argument that the medications he was receiving were not

6  appropriate.

7        To summarize, the undisputed evidence shows the following.  Seroquel and Mellaril

8  are not prescribed at CJMH because of their potential for abuse and serious side effects, and

9  Risperdol is considered an equally effective anti-psychotic without such associated problems.

10  Upon plaintiff's first meeting with Dr. Rosenthal shortly following plaintiff's arrival at

11  SRCJ, he told Dr. Rosenthal that he had been helped by Risperdol in the past. Consequently,

12  Dr. Rosenthal prescribed Risperdol, among other drugs, for plaintiff in March 2007, and

13  subsequently increased the dosage of Risperdol and other medications as plaintiff reported

14  symptoms that warranted such increases in Dr. Rosenthal's medical judgment.  Dr. Rosenthal

15  also added an additional anti-psychotic medication, Haldol, to plaintiff's medication regimen

16  when plaintiff told Dr. Rosenthal that Haldol had helped in the past.

17        By August 23, 2007, plaintiff's behavior issues had sufficiently improved to the point

18  that Dr. Rosenthal determined he was able to leave the mental health unit and return to the

19  general population.  Additionally, plaintiff was diagnosed by his therapist as malingering.

20  Plaintiff's medications nevertheless were continued at his next two appointments, in

21  September and October 2007.  On November 7, 2007, he was transferred to Atascadero.

22  Between the date of plaintiff's arrival at SRCJ in March 2007 and his transfer to Atascadero

23  in November 2007, plaintiff refused to attend six CJMH mental health appointments.

24        When plaintiff returned from Atascadero in March 2008, he reported that he had taken

25  no anti-psychotic medications in two months; Dr. Thomas evaluated him and prescribed

26  Prozac for depression.  Less than two weeks later, plaintiff asked Dr. Thomas to prescribe

27  Seroquel and other anti-psychotics for him, but refused to allow Dr. Thomas to evaluate him.

28  Three weeks later, plaintiff was again seen by Dr. Thomas and also by therapist Resburg.

United States District Court

For the Northern District of California

1  Although plaintiff continued to ask for anti-psychotic medications, neither Dr. Thomas nor

2  Resburg noted any objective findings to support prescribing such medications.

3      Over the course of the next several months, plaintiff continued to ask Dr. Thomas to

4  prescribe anti-psychotic medications, but Dr. Thomas never observed any objective or overt

5  indications of psychosis or psychiatric disorders or any medical indication for treatment with

6  anti-psychotics.  At times plaintiff appeared anxious and depressed, and Dr. Thomas

7  discussed the use of mood stabilizers to help with irritability associated with plaintiff's

8  primary diagnosis of personality disorder, as well as a low dose of anti-psychotic medication

9  for depression.  Plaintiff initially refused to consider mood stabilizers, but eventually agreed

10 to take one, as well as a low dose of Risperdol for depression. Dr. Thomas also continued

11 plaintiff's prescription for Prozac.

12     In December 2008, plaintiff again asked Dr. Thomas to prescribe Seroquel.  Dr.

13 Thomas wrote in the medical record that plaintiff did not have psychotic symptoms and told

14 plaintiff no anti-psychotics would be prescribed.  When Dr. Thomas saw plaintiff again in

15 January 2009, he diagnosed plaintiff as malingering.  Over the course of the next five

16 months, plaintiff refused to attend three follow-up appointments and, as a result, his

17 prescriptions expired.  After the prescriptions were renewed in May 2009, plaintiff again

18 refused, over a period of three months, to be evaluated by Dr. Thomas and to attend two

19 scheduled appointments.  Again, the prescriptions expired.  Thereafter, through February

20 2010, when the instant motion for summary adjudication was filed, plaintiff again had his

21 medications adjusted by Dr. Thomas, and also refused to see Dr. Thomas on two occasions.

22     In short, the evidence establishes that plaintiff received regular and substantial mental

23 health treatment and was prescribed a detailed psychiatric medication regimen, which

24 plaintiff's prescribing doctors, Drs. Rosenthal and Thomas, adjusted over time, in accordance

25 with their best medical judgment.  Further, the evidence shows that CJMH Director Swafford

26 investigated and responded to plaintiff's concerns about his mental health care, as did SRCJ

27 officials.

28     Accordingly, the Court finds plaintiff has failed to raise a triable issue with respect to

United States District Court

For the Northern District of California

1  whether any CJMH defendant responsible for plaintiff's treatment with psychiatric

2  medication chose a course of treatment in conscious disregard of a substantial risk to

3  plaintiff's mental health, nor has plaintiff raised a triable issue as to whether any CJMH or

4  SRCJ supervisory official failed to respond appropriately to plaintiff's mental health

5  requests.

6  　　　　　　　　　2.　　　Inadequate Mental Health Care

7  　　　　Plaintiff's second claim is that CJMH medical personnel acted with deliberate

8  indifference to his serious mental health needs by failing to see him often enough between

9  July 13 and August 27, 2007, and again between September 3 and October 27, 2008.

10  Plaintiff's claim of deliberate indifference is wholly unsupported by the record.

11  　　　　The undisputed evidence shows that during the first period of six weeks, in the

12  summer of 2007, plaintiff was scheduled to be seen six times by CJMH mental health

13  personnel, he refused to come to one appointment, he missed one appointment because he

14  was in court, and he was seen four times, including the appointment he had on the last day of

15  the relevant time period.  Further, there is nothing in the record to support an inference that

16  plaintiff's condition worsened during that time; instead, by August 23, 2007, his symptoms

17  had improved to the extent that he was cleared to leave mental health housing and rejoin the

18  general population, where he stayed until he was transferred to Atascadero in November

19  2007.

20  　　　　In regard to the second period of six weeks, in the fall of 2008, the undisputed

21  evidence shows that plaintiff was scheduled to see Dr. Thomas on August 28, but that the

22  appointment was rescheduled for September 8 because of Dr. Thomas's unavailability.  At

23  the September 8 appointment, plaintiff reported hearing voices and having anxiety, but

24  showed  no overt signs of delusions or psychiatric disorders and reported no acute psychiatric

25  issues.  Consequently, Dr. Thomas increased plaintiff's Risperdol dosage and scheduled a

26  return for October 13.

27  　　　　When Dr. Thomas was unable to keep the October 13 appointment, he rescheduled

28  plaintiff to be seen on October 27.  When seen on that date, plaintiff showed no objective

signs of any psychiatric disorder and presented essentially as he had on September 8, specifically, anxious and depressed, with no indication of any psychiatric injury due to the missed appointment.  In sum, plaintiff's claim regarding the period in the fall of 2008 amounts to plaintiff's dissatisfaction with the fact that his regular monthly psychiatric appointment was delayed for two weeks due to Dr. Thomas's unavailability.  The record shows, however, that at the relevant time, plaintiff was not showing any objective symptoms of a psychiatric disorder, and that his mental condition after the two-week delay was no different than before the delay.

Based on the above, the Court finds there is an absence of evidence to support plaintiff's claim that he received inadequate mental health care during the two above-noted time periods.

3.  Conclusion

Plaintiff has failed to present evidence sufficient to raise a triable issue with respect to whether any CJMH or SRCJ defendant acted with deliberate indifference to plaintiff's serious mental health needs.  Accordingly, summary adjudication will be granted to the CJMH and SRCJ defendants on plaintiff's mental health claims.

**CONCLUSION**

For the foregoing reasons, the Court orders as follows:

1.  The Alameda County defendants' motion to file records under seal is hereby GRANTED.  The Clerk of the Court shall file the records under seal pursuant to Civil Local Rule 7-11.

2.  The Alameda County defendants' motion for summary adjudication is hereby GRANTED, and judgment shall be entered in favor of the following Alameda County defendants: SRCJ Deputies Anderson, Arnold, Arrivas, Bao, Barrosa, Brawley, Cabreras, Cody, Dalton, De La Fuente, Gonzales, Robertson, Snider, St. Denis, and Strickland; Sgts. Molloy and Shaull;  Technicians Bryan and Marks; Commander Harris; CJMH Drs.

United States District Court
For the Northern District of California

1    Rosenthal and Thomas; therapist Resburg; Director Swafford.[15]

2         3.  The PHS defendants' motion for summary judgment is hereby GRANTED, and

3    judgment shall be entered in favor of the following PHS defendants: Prison Health Services,

4    Inc.; Drs. Harold Orr and I-Fei Chen; Maria Sardi, R.N.; Wilfredo Reyes, L.V.N.

5         This order terminates Docket Nos. 172, 176 and 195.

6         IT IS SO ORDERED.

7    DATED: September 24, 2010

8                                                    _____
                                                     MAXINE M. CHESNEY
9                                                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27       [15]The following Alameda County defendants remain in the instant action, to the extent
     they are named as defendants in claims other than plaintiff's medical and mental health care
28   claims: SRCJ Deputies Barao, Boutwell and McGill; Lt. Jurgens-Lewis; Capt. Melansen.

**United States District Court**
For the Northern District of California